CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ADAM OLIN (Bar No. 298380)
(E-Mail: Adam_Olin@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-1462
Facsimile: (213) 894-0081

Attorneys for Defendant
WILLIAM SADLEIR

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM SADLEIR,<br><br>Defendant. | Case No.  2:20-CR-299-DMG<br><br>**DEFENDANT WILLIAM SADLEIR'S SENTENCING MEMORANDUM** |

Defendant William Sadleir, through counsel, hereby submits this sentencing memorandum for the Court's consideration prior to sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 21, 2022          By: */s/ Adam Olin*
                                                      Adam Olin
                                                      Deputy Federal Public Defender
                                                      Attorney for William Sadleir

1

**I. INTRODUCTION**

2    For more than sixty years, William Sadleir led a life of service that could, by all

3 accounts, be described as a success. The child of a middle class Mormon family, Mr.

4 Sadleir became an Eagle Scout, attended Brigham Young University, and served a

5 mission in France with the man who would become his best friend. Mr. Sadleir joined

6 the Peace Corps after BYU, spending his time in the Dominican Republic and

7 Washington, D.C. He entered government service after the Peace Corps, rising to

8 become Special Assistant to President Ronald Reagan, serving as the director of

9 presidential appointments and scheduling, before serving in the State Department as

10 Deputy Assistant Secretary of State. Following his decision to leave the Mormon faith

11 in the early 2000s, and the consequent dissolution of his marriage from that choice, Mr.

12 Sadleir became an entrepreneur in the entertainment industry in Los Angeles, where he

13 met his current wife with whom he shares two young children. Mr. Sadleir founded

14 Aviron Pictures and its predecessor company, through which he distributed films

15 starring some of the industry's most famous names.

16    But that positive, successful life came to an end in the past years, as quickly

17 became evident in May 2020. Mr. Sadleir was removed from Aviron in late 2019

18 following the discovery of a fraud involving an institutional investor of Aviron's, for

19 which he has pleaded guilty and been sentenced to 72 months in the Southern District

20 of New York (the "SDNY matter"). Aviron's employees were largely terminated over

21 the following months, and Mr. Sadleir desperately sought ways to relaunch Aviron,

22 whether in that form or under a different name. And so when he learned of funds

23 designed for keeping people in work under the CARES Act, Mr. Sadleir sought a loan

24 to do it. It was, indisputably, fraudulent: Mr. Sadleir's applications contained false

25 statements about existing payroll. Mr. Sadleir has pleaded guilty for those submissions.

26    Mr. Sadleir's conduct, in each case, was serious, meriting a significant sanction.

27 And the sentence imposed in the SDNY matter—72 months—appropriately punishes

28 Mr. Sadleir globally for his conduct. In light of the U.S. Attorney's Office for the

2

Central District of California's agreement to recommend a concurrent sentence in this matter, the presiding judge in the SDNY matter, the Honorable Paul A. Engelmayer, expressly sought to fashion a sentence which would adequately punish Mr. Sadleir for both cases. Given that, the appropriate sentence here is one in line with Probation's recommended sentence of 30 months, concurrent to the SDNY matter. Additional, consecutive time does little to advance the purposes of § 3553(a) for a man who will be released from custody in his early seventies following his only incarceration, with no serious risk of recidivism.

For these reasons, Mr. Sadleir respectfully requests that the Court sentence him to a term of 33 months, concurrent to his sentence in the SDNY matter.

## II. THE PRESENTENCE REPORT

The Probation Office calculates a total offense level of 23 and criminal history category I. PSR at 4. The parties agree the offense level is correct. However, in light of Mr. Sadleir's recent sentencing in the SDNY matter, which occurred after the issuance of the PSR, he agrees with the government that his criminal history category is II. The resulting range is 51–63 months. Probation has recommended a 30 month sentence, concurrent to the SDNY matter, which represents a four-level variance from the guideline range as initially calculated in the PSR. ECF No. 88 at 2. A similar variance under the updated criminal history category would result in a recommendation of 33 months.[1]

---

[1] Mr. Sadleir does request one modification to the PSR. While at the time of the presentence interview his permanent address remained in the Los Angeles area, his family is planning on relocating to the Tallahassee area. In order to protect the family's privacy, counsel will independently inform Probation of the new address.

### III. THE APPROPRIATE SENTENCE

**A.    A Concurrent Sentence, As Recommended by the Government and Probation, Is Appropriate**

The Court should follow the recommendation of the parties and probation and impose a sentence concurrent to the 72-month sentence imposed in the SDNY matter.

#### 1.    The SDNY Sentence Already Accounted for the PPP Fraud

First, there is no need to impose a period of consecutive time here in an attempt to provide independent punishment for the PPP fraud because the SDNY court specifically fashioned a sentence to address both offenses.

The plea agreement in this case—and the Central District USAO's agreement to recommend concurrent time—had already been filed when Mr. Sadleir appeared for sentencing in the SDNY matter on September 9, 2022. *See* ECF No. 84 (plea agreement filed on March 10, 2022). In light of that agreement, the Southern District of New York USAO's urged Judge Engelmayer to "consider the PPP fraud as an aggravating 3553(a) factor in imposing sentence in [the SDNY] case." Ex. A (SDNY Sentencing Memorandum) at 8. And Judge Engelmayer in fact did so. At sentencing, Judge Engelmayer indicated that he would "need to factor in the PPP fraud in my assessment of the 3553(a) factors. Otherwise, and it's a matter in practice, unless the Court in California was to disregard that recommendation, it goes unaccounted for." Ex. B (SDNY Sentencing Transcript) at 9:15–18; *see also id.* at 9:23–24 (stating that the government was "effectively asking me to sentence Mr. Sadleir in toto considering the California as well as New York charges"). And throughout the hearing, Judge Engelmayer made clear his sentence would account for the PPP fraud because of the concurrent recommendation. For example, he stated that he "just want[ed] to make sure that all agree that the recommendation in California will be for a concurrent sentence with whatever I impose here, and therefore, it's appropriate for me to consider the PPP fraud, in effect, as part of, if not literally the offense conduct, under 3553(a)." *Id.* at

19:5–9.[2] Put another way, Judge Engelmayer viewed his mandate as "consider[ing] the California conduct but that the price of that is that in the California case the government will bind itself to a recommendation that the sentence there be concurrent, *i.e.*, nothing incremental there." *Id.* at 36:5–8; *see also id.* at 65:11–13 (stating it was "essential that the sentence here at least take into account the fact of the PPP fraud, lest it effectively go unpunished").

Given that the SDNY sentence explicitly addressed the conduct underlying this matter, Mr. Sadleir respectfully submits that the Court need not impose a period of consecutive custody here.

### 2.   Seventy-Two Months Is Sufficient to Adequately Punish Mr. Sadleir

A total 72 month sentence achieves the purposes of § 3553(a) for Mr. Sadleir's full range of conduct. Certainly six years in custody is a significant punishment on its own. But for a person in Mr. Sadleir's position, his fall from grace was precipitous, irrevocably ostracizing him from the entertainment industry community in which he has spent the past decades working. The coverage of his conduct has been constant, since his arrest in May 2020 and through the present, ranging from influential trade publications like *Variety* and the *Hollywood Reporter*, to national sources like the *Los Angeles Times, Bloomberg*, and *Reuters*. For the rest of his remaining life, Mr. Sadleir will be known for the conduct in these two cases. He will never again work in entertainment, or, likely, a position of prominence or trust in business.

The sense of shame and anguish Mr. Sadleir feels over what he did is reflected not only in his own letter to the Court, but also in those of his family and friends. *See* Exs. F–H. He has destroyed the business that he created from the ground up, and he

---

[2] It also does not appear that the guidelines would have been different had either case been transferred under Rule 20, given the significant gulf between the loss amounts in the respective cases. *See* Ex. B at 19:11–14 ("THE COURT: Had the PPP fraud been charged here, would it have changed the overall guideline calculation? [SDNY AUSA]: Judge, I don't—let me just confirm, I don't believe that's the case."). But because neither U.S. Attorney's Office would consent to a Rule 20 transfer, the matters were resolved separately.

bears the burden of knowing that more than three dozen Aviron employees abruptly lost their jobs as a result of his conduct. Because Aviron's collapse occurred in January 2020, just weeks before the start of the pandemic that largely shut down the movie business and caused the collapse of many other independent theatrical distribution companies, most of those former Aviron workers remain unemployed and without benefits.

### 3.   Seventy-Two Months Is Enough to Protect the Public

Nor will Mr. Sadlier pose a serious risk of recidivism. Mr. Sadleir is nearly seventy years old, with no criminal history prior to the conduct underlying the SDNY matter and this case.[3] He has never been in custody before. And he has the type of health issues common in men of his age. *See* PSR ¶¶ 67–68 (reflecting, among other things, multiple stints in his heart and medication for hypertension and cholesterol). Those health issues will only be further compounded by institutional confinement. *See* Mirko Bagaric et al., *A Principled Approach to Separating the Fusion Between Nursing Homes and Prisons*, 44 PEPP. L. REV. 957, 968 (2017) (explaining that "the physiological age of an incarcerated individual is approximately ten to fifteen years older than a nonincarcerated person of the same age"). Mr. Sadleir will be in his early seventies when he is released from custody, having spent years away from his two young sons. He will not jeopardize his remaining time with them by reoffending.

### B.   The Offense, While Serious, Is Mitigated By Mr. Sadleir's Intent to Obtain a Single Loan and His Good-Faith Efforts to Relaunch His Company

### 1.   Mr. Sadleir Sought to Relaunch a Film Distribution Company

Mr. Sadleir's conduct was undoubtedly and admittedly criminal. As set forth in the PSR and the plea agreement, he intentionally submitted false statements to the SBA

---

[3] There is one anomalous petty theft arrest that led to a dismissal, for which there do not appear to be any details. *See* PSR ¶ 56.

that each of the three Aviron entities[4] who applied for a PPP loan had payroll expenses. In reality, those payroll figures largely reflected the employees of Aviron Pictures, the operating Aviron entity whose employees were mostly terminated by February 2020, viewed through the lens of Mr. Sadleir's aspirations for a relaunched film distribution company. Mr. Sadleir freely admits that neither of those three Aviron entities in fact employed those individuals at the time of the applications. That renders his conduct criminal.

But as the Court considers the appropriate sentence under § 3553(a), Mr. Sadleir asks it to consider the context of the offense. Aviron Pictures, which Mr. Sadleir founded and led as the chief executive, was functionally shuttered by February 2022.[5] The dozens of employees who had worked for him struggled to find new employment in the entertainment industry, particularly as the pandemic raged in its early days. And so upon the announcement of the CARES Act and the PPP funds, Mr. Sadleir took steps in good faith to restart a film distribution company with individuals from Aviron. Around March 2020, Mr. Sadleir began contacting various former Aviron Pictures employees, citing the availability of PPP loans. *See, e.g.*, Ex. C (Gillman 302). These discussions proceeded over the next months, capped off by a Zoom meeting conducted between Mr. Sadleir and other key figures from Aviron Pictures in May 2022. Ex. D (Relaunch Email). While the participants intended on continuing to explore the opportunity, Mr. Sadleir was ultimately arrested a week later. ECF No. 7 (reflecting May 22, 2020 arrest).

Hence, in comparison to many PPP fraud prosecutions, Mr. Sadleir intended on deploying PPP funds for legitimate ends. That does not, of course, absolve Mr. Sadleir

---

[4] These entities are Aviron Group, Aviron Releasing, and Aviron Licensing. *See* ECF No. 84 at 12 (plea agreement).

[5] Mr. Sadleir recognizes Blackrock took control following the discovery of his conduct underlying the SDNY matter.

1   of criminal liability. But it bears upon the appropriate sentence, and suggests that the
2   existing 72 month term is sufficient for his conduct.

3       2.   Mr. Sadleir Intended to Obtain One Loan and Returned the Funds for
4            the Additional Two

5       The plea agreement and the PSR accurately reflect that Mr. Sadleir applied for
6   three separate PPP loans through JPMorgan Chase ("JPMC") for a total of
7   approximately $1.7 million. However, it was his intention to obtain a single loan of
8   approximately $560,000. Mr. Sadleir made an initial application for Aviron Group on
9   April 7, 2020. PSR ¶ 23. At that time, Mr. Sadleir consulted with his private banker at
10  JPMC who recommended he re-submit an application under a different entity's name
11  given ongoing issues with the PPP program. And so Mr. Sadleir thereafter applied on
12  April 9, 2020, for a loan for Aviron Releasing. *Id.* ¶ 24. Two more weeks passed
13  without results, leading Mr. Sadleir to consult further with his JPMC banker. He then
14  submitted a third application for Aviron Licensing on April 24, 2020. *Id.* ¶ 25. Then,
15  without warning, all three loans were approved and funded on the same day in a total
16  amount of approximately $1.7 million. *Id.* ¶ 26. Mr. Sadleir ultimately directed JPMC
17  to return the PPP loans disbursed to Aviron Licensing and Aviron Releasing, leaving
18  the initially requested loan for Aviron Group. Ex. E.; *see also* PSR ¶ 29 (confirming
19  return of approximately $1.12 million).

20      Thus, Mr. Sadleir's overall purpose was to obtain the single loan. While all three
21  loans are properly counted under § 2B1.1(b)(1), that he returned the majority of the
22  funds bears consideration under § 3553(a).

23  **C.   Designation Request**

24      Finally, Mr. Sadleir respectfully requests that the Court recommend that he be
25  designated to FPC Pensacola. His family intends on relocating to the Tallahassee area,
26  near which his wife's family and support system live, as well as his eldest son.

27

28

8

## IV. CONCLUSION

For the foregoing reasons, Mr. Sadleir respectfully requests that the Court sentence him to a term of 33 months in custody, concurrent to his sentence in the SDNY matter.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 21, 2022        By: */s/ Adam Olin*

Adam Olin
Deputy Federal Public Defender
Attorney for William Sadleir

**DECLARATION OF ADAM OLIN**

I, Adam Olin, hereby state and declare as follows:

1.     I am a Deputy Federal Public Defender in the Central District of California assigned to represent William Sadleir in the above-titled action.

2.     Attached as Exhibit A are true and correct excerpts from the government's sentencing memorandum in *United States v. Sadleir*, 20-CR-320-PAE, ECF No. 81 (S.D.N.Y. June 7, 2022) (the "SDNY matter").

3.     Attached as Exhibit B are true and correct excerpts from the transcript of Mr. Sadleir's sentencing in the SDNY matter.

4.     Attached as Exhibit C is a true and correct copy of a March 1, 2022, 302 produced in discovery.

5.     Attached as Exhibit D is a true and correct copy of a May 14, 2020, email between Mr. Sadleir and Aviron-related individuals discussing the relaunching of Aviron.

6.     Attached as Exhibit E is a true and correct copy of a May 13, 2020, email from Mr. Sadleir to JPMC.

7.     Attached as Exhibit F is a true and correct copy of a letter from Mr. Sadleir to the Court.

8.     Attached as Exhibit G is a true and correct copy of a letter from Hannah Sadleir to the Court.

9.     Attached as Exhibit H is a true and correct copy of a letter from Jonathan Neville to the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED:  September 21, 2022         By: */s/ Adam Olin*
_____
Adam Olin
Deputy Federal Public Defender

10

# EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 7, 2022

BY CM/ECF

Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

     Re:    *United States v. William Sadleir*, 20 Cr. 320 (PAE)

Dear Judge Engelmayer:

     The Government respectfully submits this letter in connection with the sentencing of the defendant, William Sadleir, which is scheduled for June 14, 2022 at 10:00 a.m., and in response to the defendant's sentencing submission dated June 1, 2022 ("Def. Sub."). The parties agree that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range applicable to the defendant is 108 to 135 months' imprisonment, and the Probation Department agrees with that calculation, as set forth in the Presentence Report ("PSR"). For the reasons set forth below, the Government respectfully submits that a sentence of approximately 108 months' imprisonment, at the bottom of the Guidelines range, is appropriate in this case.

**The Offense Conduct**

     William Sadleir was the chairman and chief executive officer of Aviron Pictures, LLC, a film production and distribution company based in Los Angeles, California. Sadleir participated in two fraudulent schemes (together, the "Schemes") relating to an approximately $75 million investment made by the BlackRock Multi-Sector Income Trust ("BIT") in Aviron Pictures, LLC and its associated entities ("Aviron").

     In one scheme, the "Advertising Scheme," Sadleir misappropriated millions of dollars in funds that BIT had invested in Aviron. Sadleir represented to BIT that Aviron had in turn invested this money in pre-paid media credits[1] with the media and advertising planning and

---

[1] Pre-paid media credits, also sometimes referred to as "up fronts," are advance commitments by large clients for media advertising over a given period, which a media buyer then purchases in bulk from media outlets, aggregating clients' commitments and usually obtaining a discount based on its market power from such aggregation. Sadleir represented, however, that such

COVID-19 pandemic. Prosecutors in the Central District of California have agreed to recommend that whatever sentence is imposed in the PPP Fraud case run concurrently with the sentence imposed by the Court in this case. Accordingly, this Court should consider the PPP fraud as an aggravating 3553(a) factor in imposing sentence in this case.

Additionally, as discussed in the Government's motions *in limine*, Dkt. 56, Sadleir defrauded Cairn Capital ("Cairn"), a London-based alternative credit asset manager. Sadleir defrauded Cairn by providing false performance data to Cairn regarding the performance of the movie *Serenity* and thereby triggering a contractual right to a three-million-dollar payment to which Sadleir was not entitled (the "Cairn Fraud"). The Government uncovered the Cairn Fraud in the course of investigating the UCC Fraud, and the facts of the two frauds are intertwined. Cairn had provided approximately $20 million in principal lending to Aviron, which proceeds were to be applied toward a movie Aviron was to distribute, *Serenity*.[5] The release of the loan's three-million-dollar final advance was conditioned upon *Serenity* achieving certain agreed-upon performance metrics. Sadleir provided Cairn with performance reporting documents from a third party, National Reporting Group, that fabricated the metric that *Serenity* had achieved (suggesting it had satisfied the contractual requirement), in order to induce Cairn to release the final advance. That email from Sadleir and its attachment is appended as Exhibit 1607. Cairn later received the reporting directly from National Reporting Group; that reporting had a significantly lower rating than the agreed-upon metric. An email from National Reporting Group with legitimate data (prior to its being doctored by Sadleir) is attached hereto as Exhibit 1702. After investigating the matter, Cairn circulated a draft complaint to Aviron and demanded repayment of the final advance as fraudulently obtained. Ultimately, in May and June 2019, the parties reached a settlement, in which Aviron agreed to repay Cairn the three million dollars of the final advance (the "Settlement Payment"), in return for Cairn's agreement not to file suit. Purely Capital Alpha Limited ("Purely Capital") made the Settlement Payment to Cairn. Purely Capital was the recipient of Sadleir's illicit and fraudulent sale in July 2019 of certain assets worth an estimated three million dollars that secured BIT's loans to Aviron – the conduct at issue in the UCC Scheme. In other words, Sadleir engaged in the UCC Scheme in order to generate the money he owed for having defrauded Cairn.

The Government respectfully submits that the Court should consider the Cairn Fraud as relevant under the Section 3553(a) factors, and specifically in response to Sadleir's emphasis in his sentencing submission on his lack of criminal history and the claimed absence of a need for specific deterrence. The Cairn Fraud provides another data point evidencing Sadleir's willingness to lie and cheat when it serves his ends, and undermines the defense claim that "the conduct at the heart of these cases is deeply out of character" for Sadleir. Def. Sub. at 1.

### 5. Sadleir's Personal History and Position of Privilege

Sadleir has led an extraordinarily privileged life. He is by all accounts intelligent and charismatic, and possesses a resume that includes a degree from Harvard Business School. He served as a special assistant and director of presidential appointments and scheduling to a sitting

---

[5] The loan was secured by, among other things, the Beverly Hills Residence.

# EXHIBIT B

M99WsadS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         20 Cr. 320 (PAE)

5    WILLIAM SADLEIR,

6                Defendant.
                                         Sentence
7    ------------------------------x

8                                        New York, N.Y.
                                         September 9, 2022
9                                        11:00 a.m.

10   Before:

11
                      HON. PAUL A. ENGELMAYER,
12
                                         District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  JARED P. LENOW
          ELIZABETH A. HANFT
17        Assistant United States Attorneys

18   BOIES SCHILLER FLEXNER LLP
          Attorneys for Defendant
19   BY:  VALECIA BATTLE
          MATTHEW L. SCHWARTZ
20

21   Also Present:  Special Agent Daniel Mardakhayev, FBI

22

23

24

25

1    our factual submission here is very detailed and addresses the

2    nature of the conduct and what occurred with respect to

3    BlackRock.  So I could only speculate, but I do hope the Court

4    believes it has a full set of facts before it, though.

5          THE COURT:  Oh, I didn't feel like anything was

6    lacking from my perspective, but victims often want to be

7    heard, and I was curious why they didn't.  And it may well be

8    that they feel that the government's recapitulation captures

9    everything.

10          A curiosity of the case is that there is a separate

11   prosecution in Los Angeles in connection with the so-called PPP

12   fraud.  I understand the parties have agreed that the

13   government will recommend that whatever sentence I impose here,

14   the Central District of California sentence run concurrent to

15   it.  Therefore, it seems to me that I need to factor in the PPP

16   fraud in my assessment of the 3553(a) factors.  Otherwise, and

17   it's a matter in practice, unless the Court in California was

18   to disregard that recommendation, it goes unaccounted for.

19          Are there any victims of the PPP fraud who have

20   indicated they wish to be heard?

21          I recognize they don't have a formal right to be heard

22   in this proceeding, but as a practical matter, given that

23   you're effectively asking me to sentence Mr. Sadleir in toto

24   considering the California as well as New York charges, I'm

25   eager to know whether any of them expressed an interest in

1    quite a bit of thought.  And in light of the factors I've

2    articulated, we do think 108 months would be an appropriate

3    sentence.

4              THE COURT:  Apropos of that, let's just discuss the

5    PPP fraud.  I just want to make sure that all agree that the

6    recommendation in California will be for a concurrent sentence

7    with whatever I impose here, and therefore, it's appropriate

8    for me to consider the PPP fraud, in effect, as part of, if not

9    literally the offense conduct, under 3553(a).

10             MR. LENOW:  We think that's correct, Judge.

11             THE COURT:  Had the PPP fraud been charged here, would

12   it have changed the overall guideline calculation?

13             MR. LENOW:  Judge, I don't -- let me just confirm, I

14   don't believe that's the case.

15             THE COURT:  I think it keeps you in the same band of

16   loss, for whatever value that has; it increases the loss amount

17   but it keeps you, from a strictly guidelines perspective, in

18   the same place, I think.

19             MR. LENOW:  Yes, Judge.  If I could just have a second

20   to confer with my colleague?

21             THE COURT:  By all means.

22             Specifically, the cutoff under 2B1.1 is between 25 and

23   $65 million.

24             MR. LENOW:  Right.

25             THE COURT:  So from a loss perspective, you'd have to

M99WsadS

 1   here first.

 2         MR. SCHWARTZ:  Right.

 3         THE COURT:  It's going forward today, and my

 4   understanding is that the parties here are in agreement that I

 5   should consider the California conduct but that the price of

 6   that is that in the California case the government will bind

 7   itself to a recommendation that the sentence there be

 8   concurrent, *i.e.*, nothing incremental there.

 9         MR. SCHWARTZ:  I mean I --

10         THE COURT:  We can't have a situation where you get to

11   say don't really consider the PPP in full here, but government,

12   bind yourself to concurrency there.  That's obviously not

13   workable.

14         MR. SCHWARTZ:  Well --

15         THE COURT:  You've got a guilty smile on your face.

16         MR. SCHWARTZ:  This is what, for a very long time, we

17   tried to do -- one agreement that encompassed all of this, and

18   that ended up being unworkable for various reasons of

19   governmental administration.  And so we're in the position of

20   being a little bit whipsawed.

21         I don't disagree that it's appropriate for your Honor

22   to consider any facts that you find to be relevant and that are

23   statutorily relevant to sentencing, and I don't disagree with

24   you that it's significant that there's going to be a

25   recommendation of concurrence.  At the same time, I think we

1    Aviron.  You did that by forging the signature of a BlackRock

2    portfolio manager, Randy Robertson, a real live human being, to

3    make it appear that he had authorized the release of UCC liens

4    on those assets, which he most certainly did not.  You then

5    sold those assets.

6           And third, there was the PPP fraud.  Although your

7    guilty plea to that offense was in a California federal court,

8    the parties have agreed to recommend that the sentence there be

9    concurrent to the sentence I impose here.  As a result,

10   assuming that the judge in your California case will heed that

11   recommendation, it's essential that the sentence here at least

12   take into account the fact of the PPP fraud, lest it

13   effectively go unpunished or underpunished.  That fraud began

14   after the pandemic started in 2020, and it began after your

15   frauds on BlackRock had been detected, after a criminal

16   investigation into those frauds was underway and known to you,

17   and after BlackRock, in fact, had taken civil action against

18   you.

19           Rather than learning a lesson from all of that, soon

20   after the Paycheck Protection Program had begun to help

21   businesses continue to pay employees during the pandemic, you

22   exploited it, and although there was some equivocation from the

23   back table, I am relying today on the account of that offense

24   that is contained in the plea agreement that you entered into

25   in federal court in California that is attached to the

# EXHIBIT C

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry ____03/01/2022____

     KEELY A GILLMAN (GILLMAN), date of birth (DOB) ███████ ███, phone
number ███████-████, email address ██████████████████, home address
█████████████████████████████, was interviewed by
telephone by Special Agent Nathan Cherney. After being advised of the
identity of the interviewing Agent and the nature of the interview, GILLMAN
provided the following information:

     GILLMAN started working at CLARIUS since it was formed around 2014.
Eventually CLARIUS turned into AVIRON PICTURES. GILLMAN worked for AVIRON
PICTURES. There was no one else at AVIRON with the last name "Gillman." At
AVIRON PICTURES, GILLMAN was the Vice President of Research, and later
became the Senior Vice President of Research. GILLMAN's salary was
approximately ███████. GILLMAN was terminated from AVIRON PICTURES around
January 2020 as part of the layoffs.

     AVIRON GROUP, AVIRON RELEASING, and AVIRON LICENSING were AVIRON-related
entities. GILLMAN thought of AVIRON GROUP, AVIRON RELEASING, and AVIRON
LICENSING as other divisions of AVIRON PICTURES that dealt more with
funding. GILLMAN was only ever employed by AVIRON PICTURES, not AVIRON
GROUP, AVIRON RELEASING, or AVIRON LICENSING.

     GILLMAN was never offered a job from or received payroll from AVIRON
PICTURES, AVIRON GROUP, AVIRON RELEASING, or AVIRON LICENSING after being
terminated in January 2020. GILLMAN started working for ████████████████
around mid-February 2020.

     Around March 2020, WILLIAM SADLEIR (SADLEIR) mentioned potentially
starting a new company and getting funding. SADLEIR did not offer GILLMAN a
job after GILLMAN was terminated from AVIRON PICTURES in January 2020.
SADLEIR mentioned if he started a new company SADLEIR could get Paycheck
Protection Program (PPP) loans for funding to keep the new company afloat.
SADLEIR told GILLMAN the Government was giving money to companies to keep
them afloat. SADLEIR told GILLMAN the PPP loans were an option to get the
new company off the ground.

Investigation on ___02/25/2022___ at  Los Angeles, California, United States (Phone)

File # ___29O-LA-3267808___                                   Date drafted ___02/28/2022___

by  CHERNEY NATHAN ALEXANDER

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

USAO_00005103

FD-302a (Rev. 5-8-10)

29O-LA-3267808

(U) Interview of Keely A Gillman

Continuation of FD-302 of (2.25.2022) _____, On 02/25/2022 , Page 2 of 2

SADLEIR lost control of AVIRON PICTURES around December 2019. SADLEIR was not allowed in AVIRON PICTURES' office. SADLEIR was not in control of AVIRON PICTURES in any way in April and May 2020.

GILLMAN would accept service of a trial subpoena by email.

# EXHIBIT D

**Adam Olin**

| | |
|---|---|
| **From:** | Claire Heath ██████████████████ |
| **Sent:** | Thursday, May 14, 2020 3:38 PM |
| **To:** | William Sadleir |
| **Cc:** | Greg Forston; jeffelefterion ██████████ Keely gillman; yarra26 ████████ kentpreston ██████████ |
| **Subject:** | Re: Business Relaunch Meeting |

Hi, there -

Look forward to "seeing" you all tomorrow at 3:30p!

Zoom meeting link below:
https://us02web.zoom.us/j/86800906031

Thanks!

> On May 14, 2020, at 3:33 PM, William Sadleir ████████████████████ wrote:
>
> Hi All:
>
> I have not yet heard back from Jeff, but the general consensus is to have the meeting via Zoom, which Claire has offered to set up for 3:30pm tomorrow.
>
> I'm looking forward to a productive discussion.
>
> Warmest regards,
>
> Will
>
> On Thu, May 14, 2020 at 10:55 AM Greg Forston ████████████████ wrote:
> > I can meet at 3:30 tomorrow.  I certainly can meet by video, but go back and forth on my willingness to meet in person tomorrow.
> >
> > **From:** William Sadleir ████████████████
> > **Sent:** Thursday, May 14, 2020 9:58 AM
> > **To:** ██████████████████████████ Greg Forston ████████████████;
> > Claire Noble ██████████████████; Keely gillman ████████████
> > ██████████████████████████
> > **Subject:** Business Relaunch Meeting
> >
> > Hi Claire, Keeley, Jeff, Hannah, Preston, and Greg:
> >
> > I trust you are all well. I'd like to convene a senior summit tomorrow afternoon to discuss relaunching a production and distribution company.

I'm happy to host a covid-controlled meeting tomorrow afternoon at my house, or if it's more convenient and attractive to you, host a video conference call around 3:30pm.

Please let me know if you're available tomorrow to meet or connect, and your preference of venue.

In the meantime, please review the two articles that will provide some guidance to our discussion.

Following a successful meeting tomorrow, with a general agreement on direction, I'd like to convene an expanded meeting with additional prospective team members later next week.

With warmest regards,

Will

# EXHIBIT E

**Adam Olin**

| | |
|---|---|
| **From:** | William Sadleir ████████████████████ |
| **Sent:** | Wednesday, May 13, 2020 12:15 PM |
| **To:** | Esposito, Donna Marie |
| **Cc:** | Hannah Kadadu |
| **Subject:** | Bank Transfer Instructions & Authorization |

Dear Donna:

To further the objectives discussed in my PPP resolution email, can you please arrange the following bank transfers:



1. From Personal Account ██████████, please transfer to **Aviron Group** account ██████████ **$490,000.00**.
2. From Personal Account ██████████, please transfer to **Aviron Group** account ██████████ **$98,109.97**.
3. From Personal Account ████████████, please transfer to **Aviron Group** account ████████████ **$180,000.00**

4. Then, from **Aviron Group** account ████████, please transfer to **Aviron Licensing** ████████ **$561,045.00**
5. Then, from **Aviron Group** account ████████, please transfer to **Aviron Releasing** ████████ **$561,045.00**

As discussed, please return the PPP loans from Aviron Licensing and Aviron Releasing, both in the amounts of $561,045.00, by the deadline tomorrow.

With this completed, I would expect that all of our personal accounts and the Aviron accounts will be un-frozen. We will use the balance of ~$308K in Aviron Group, along with a subsequent contribution by our investors of ~$282K, to deploy the $590,624 funds as set forth in the PPP program for retaining/rehiring the Aviron employees. We will then follow the procedures for SBA loan forgiveness consideration at the 8 week from disbursement period. Any balance not forgiven will be repaid by Aviron Group.

Please let me know when Chase has completed the transfers and PPP refunds, as instructed and authorized above.

Thank you,

Will

**William Sadleir**
*Founder & Owner*
Aviron Group, LLC

████████████
Beverly Hills, CA, 90210

████████ | **Mobile**

1

# EXHIBIT F

Honorable Dolly M. Gee
United States District Judge
Southern District of California
United States Courthouse
Courtroom 8C, 8th Floor
350 West 1st Street, Los Angeles, CA, 90012

### Re: Sentencing of William Sadleir

Dear Judge Gee:

The remorse that I feel for the many people and institutions that were harmed by my actions is profound. I am ashamed that I betrayed the foundations of honesty that I've been taught throughout my life. I chose to rationalize my actions by convincing myself that the ultimate ends—to put my friends and colleagues back to work—justified the compromises with truth that I deployed. In the more than two years since my arrest and the ensuing public humiliation, I've reflected almost daily on the innocent victims of my crimes. Not only will my conviction and prison term be a lifelong source of embarrassment for my two little boys, who have looked up to me and trusted me to be a reliable example of honesty, but, my darling wife and loving companion, Hannah, now has the lonely burden of raising two little boys without the presence of their dad. My actions were immensely selfish and thoughtless, and Hannah is going to pay a far greater price for my crimes.

I am going to have a significant period of time in custody, and it's up to me to make that time as productive and purposeful as possible. I have a clear plan how to make an honest living, to care for my family, to be a positive force for social change, and to eventually make restitution, upon my release. I commit myself during my period of incarceration to contributing my time, education, and talent to helping other inmates who have more challenges and who have had less opportunities.

I accept full responsibility for my crimes. I am truly sorry for the pain I've caused to so many innocent victims, including the Small Business Administration. What I did was wrong, and there is no justification. I can only hope that taking responsibility for my actions will be the first step in the next chapter of my life, and that my subsequent conduct will be a source of pride for my children and my wife. Thank you for your consideration.

Sincerely,

*William F. Sadleir*

William K. Sadleir

# EXHIBIT G

Hannah K. Sadleir

███████████

Honorable Dolly M. Gee
United States District Judge
U.S. Courthouse
Courtroom 8C, 8th Floor
350 West 1st Street
Los Angeles, CA

### Re: Sentencing of William Sadleir

Dear Judge Gee:

My name is Hannah Sadleir. I was born in Israel and moved to Brooklyn when I was 9 years old. I am the youngest of seven children. I am a graduate of the University of Michigan and Harvard Business School. I'm 50 years old and have been married to William for six years; we've been together for 14 years. Together we have two beautiful children, Will, a five-year-old son, and Remington (Remy), a four-year-old son. We also have three frozen embryos, two females and one male, who we hope can join our family upon William's release from prison. Family is an integral part of my upbringing. Having a big, supportive family that always has each other's back means everything to me. William and I are creating that in our own family.

William is my best friend, a loving companion, my cheerleader, my rock, and an exceptional father. He is my support system. He is dependable, has always been faithful, and brings hope even when things seem hopeless. He is everything to me. William can fix almost anything. Our children are convinced that he has magic—producing lost items from their ears. His bedtime reading is mesmerizing and he patiently explains the "how and why" to a seemingly endless stream of questions. I cannot effectively raise our sons without William being a daily, nurturing presence in their lives. We love him so much and need him back quickly.

These past 30 months has been a period of deep reflection for William. His strengths have proved to also be his weaknesses. He is persevering, tenacious, determined, and is driven by defined goals and objectives. But, as he regretfully realized, those traits also compelled him to believe that the ends justified the means. He is deeply remorseful and knows that his conduct was not justified, although his objective was to make sure the company was successful for the benefit of its' employees. This period also helped William appreciate how little time he may have left to be a positive influence in our sons' lives. After taking responsibilities for his conduct and pleading guilty, I found a paper on his desk one morning that he had written, which gives a glimpse into William's character and values. The letter's content included the following:

### Lessons to Teach Our Children
- Learn to like what doesn't cost much.
- Learn to like reading, conversation, music.
- Learn to like fields, trees, brooks, hiking, rowing, climbing hills.
- Learn to like people, even though some of them may be different . . . different from you.
- Learn to like work and enjoy the satisfaction of doing your job as well as it can be done.
- Learn to like the songs of birds, the companionship of dogs.
- Learn to like gardening, puttering around the house, fixing things.
- Learn to like the sunrise and the sunset, the beating of the rain on the roof, windows, or tent.
- Learn to keep your wants simple, and refuse to be controlled by the likes and dislikes of others.
- Learn that the ends seldom justify the means.
- Learn that you can always earn more money, but time you will never get back.

William personifies the idea of a renaissance man. Most of his school peers knew him as an outstanding athlete; a junior Olympic volleyball player, a gymnast, and a nationally ranked freestyle skier. He excelled academically, but

was modest about it. His college scholarships reflected his diligence, in spite of the Seattle public school system, as well as reflecting his determination not to be restrained by his lower middle-class childhood. Playing the cello early in life ultimately lead to William composing and producing a 90-minute symphonic oratorio with the Royal Liverpool Philharmonic Orchestra and Choir, which performed the original composition before audiences in Norway, Denmark, Sweden, England, and America. William's appreciation for complex music lead to an early friendship and business relationship with Oscar-winning film score composer Hans Zimmer, which became William's gateway to the film industry. William is equally gifted as a fine artist; painting landscapes and portraits in oil. He also has an impressive knowledge of art history.

I met William at a birthday lunch for a mutual friend. He asked me out on a dinner date two days later. I went to the dinner date directly from work. He had pre-selected the perfect table at a romantic restaurant, and had a gorgeous bouquet of flowers brought out to me once we were seated. When I asked why all of the fuss for a first date, his reply won my heart. He smiled then calmly replied, "Someday our children will ask about our first date, and I want to make sure that they know how smitten I was from the very start". What could have been regarded as hubris was simply evidence of William's astounding ability to articulate a vision and then make it a reality. Now, in fact, our oldest son Will is fond of telling even strangers about his mom and dad's first date. Embarrassing but sweet.

Rather than giving up and conceding defeat following his arrest, William has accepted his misfortune and his mistakes and has made it a catalyst for reinvention. He has been remarkably productive during these past 30 months. He recently created Acuity Applied Physics, along with a team of the nation's leading theoretical physicists. Together, under William's leadership, Acuity is developing innovative and truly revolutionary scientific products that could have a significant positive impact on society, particularly once he's released. He is also writing feature film screenplays and the narrative outline for several documentary films.

Most important to me, I can't bear the thought of our two beautiful and bright little boys growing up without their father, whom they adore. They desperately need him in their lives. They are too young and innocent to understand why they have lost their father. There is so much he wants to teach them, to assure that they become honest, reliable, sensitive, kind, and productive adults. We aren't young. William is already the age at which both his grandfather and father died. He is such a positive and loving influence in our lives. We need him back at home as soon as possible while he's still healthy and vibrant.

Having both parents at home gives Will and Remy the security, confidence, and the self-esteem essential for mental and emotional health. Early every morning, the boys climb out of their beds and come and cuddle with us in bed. William then makes their breakfast while I get them dressed for school. At night, Will and Remy beg for their dad to read them a story and put them to bed. He plays beautiful piano melodies to help them fall asleep and to build bonding memories with them.

Few people approaching the age of 70 have children under the age of six. I can't work and raise our little boys on my own. They need their father and I need my husband and best friend.

Thank you, Judge Gee, for reviewing this letter with an open heart and compassion. I will be at the sentencing, along with Will and Remy. I am confident that it will mark an important milestone in our journey of healing and recovery. Ours is a family worth saving. William's story is not finished. I'm certain that his subsequent conduct and service to the community and nation will be a source of pride for you and all of us who have supported him during this very difficult period.

Sincerely,

*Hannah Kadur*

Hannah K. Sadleir

2

# EXHIBIT H

Jonathan E. Neville, Esq.

██████████████

Honorable Dolly M. Gee
United States District Judge
Southern District of California
United States Courthouse
Courtroom 8C, 8th Floor
350 West 1st Street, Los Angeles, CA, 90012

### Re: Sentencing of William Sadleir

Dear Judge Gee:

My name is Jonathan Neville. I've known the defendant, William Sadleir, for almost fifty years. We served together as volunteer missionaries in France when we were both 19 years old. We then became college roommates for a time, where I knew him as Bill. I was his Best Man at his wedding. We've successfully worked together in several business ventures.

Ever since I've known Bill, I've observed his determination and perseverance in the face of immense challenges. More than anyone I've known, Bill reminds me of the famous description by Theodore Roosevelt:

*"It is not the critic who counts. Not the man who points out how the strong man stumbled or where the doer of deeds could have done better. The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs and comes up short again and again; who knows the great enthusiasms, the great devotions; who spends himself in a worthy cause."*

One example of this was memorialized in a 1988 story in *Inc. Magazine*, which covered Bill's success in navigating a challenging period with his first business venture:

*"Most reasonable people in his situation would have read the handwriting on the wall and accepted the consequences. But not Sadleir. Against overwhelming odds, he scrambled like nobody I have ever seen. Sadleir's steadfast refusal to surrender makes me wonder. Was he crazy, or do most people give up too soon?"*

I've read the indictment and I understand what it says Bill has done. Knowing Bill, I'm not surprised he is acknowledging his mistakes and is taking responsibility for his actions.

He told me that he is not going to let this mistake define his personal legacy, but rather use it as a profound catalyst for reinvention. He plans to use his incarceration to contribute to society in a variety of ways, such as by writing episodic documentary features to bring national awareness and meaningful change to important social issues.

Despite whatever Bill's mistakes regarding the PPP, I hope you will tailor a sentence that, while not minimizing or ignoring those mistakes, will allow Bill to continue to lead a productive life of which his children, family, and friends will be proud.

Sincerely,

/s/ Jonathan E. Neville